UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

HUBERT CUNNINGHAM,

                Plaintiff,

    - against -

UNITED STATES OF AMERICA,

                Defendant.

--------------------------------------------------------X

**MEMORANDUM
AND    ORDER**

03 CV 3677 (CLP)

      On July 28, 2003, plaintiff Hubert Cunningham filed this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"), seeking damages for injuries suffered as a result of an incident that occurred on the morning of August 7, 2002, at the Veterans Administration Hospital ("VA Hospital") in Brooklyn, New York. Plaintiff alleges that on that morning, after he entered the VA Hospital, federal police officers employed by the Department of Veterans' Affairs used excessive force in restraining and arresting him. He has raised claims of assault and battery, intentional infliction of emotional distress, and negligence.

      Following discovery, the parties consented[1] to a bench trial before the undersigned which commenced on November 16, 2005, and continued on February 1, 2006 through February 3, 2006. Prior to trial, plaintiff stated that he did not intend to pursue his claims of intentional infliction of emotional distress or negligence, and thus the only claim before the Court on trial was the claim of assault and battery. (See Proposed Joint Pre-Trial Order at 3). In connection with that claim, plaintiff seeks compensatory damages in the amount of one million dollars.

---

[1] On September 21, 2005, the parties consented to trial before the undersigned.

(Compl. ¶ 30).

Having heard the testimony and considered the evidence and arguments presented by the parties, this Court finds in favor of defendant for the reasons set forth below.

## FACTUAL BACKGROUND

During the trial, plaintiff testified and called as witnesses, Officer Henry Flores, Officer Jamie Dunlap, and Dr. Stanley Portnow. In addition, plaintiff introduced into evidence a videotape of the incident taken from cameras installed at the VA Hospital. (See Ex. N1). The government called Brenda Torres, Dr. Stuart Kleinman, and plaintiff's counselor, Elizabeth Giasemedis, as witnesses.

A.     Testimony of Hubert Cunningham

In the summer of 2002, plaintiff Hubert Cunningham, a United States military veteran, was a patient receiving treatment at the VA Hospital, located at 800 Poly Place in Brooklyn. (Compl. at ¶¶ 8-9). At the time, Mr. Cunningham was not employed and was receiving Social Security Disability payments as a result of various illnesses from which he was suffering. (Tr. at 19).[2] Among other things, Mr. Cunningham was diabetic, suffered from coronary artery disease, and had been diagnosed in 1998 with a bipolar disorder. (Id. at 92).

On the morning of August 7, 2002, Mr. Cunningham caught the bus from his home in Staten Island to attend a regularly scheduled appointment at the Brooklyn VA Hospital. (Id. at 24-25). He testified that on that morning, he was feeling mentally fine, and that he had taken all

[2]Citations to "Tr. at " refer to the trial transcript in this case.

of his prescribed medications,[3] including Depakote, insulin, blood pressure and asthma medications. (Id. at 35-36). Upon arriving at the VA Hospital on August 7, 2002, Mr. Cunningham testified that he entered the main doors to the facility and looked at the clock because he "liked to be on time for his appointments." (Id. at 25-26). According to plaintiff, as he was looking at the clock, Officer Henry Flores,[4] who was on duty at the entrance, looked over at plaintiff. (Id. at 26). Plaintiff testified that Officer Flores asked Mr. Cunningham what he was looking at and whether there was something wrong with him. (Id.) Mr. Cunningham testified that after he responded that there was nothing wrong with him, Officer Flores asked him, "what the fuck are you looking at?" to which he replied, "Sir, I'm not looking at anything but the clock." (Id.)

After the verbal exchange with Officer Flores, Mr. Cunningham stated that he proceeded to empty his pockets and place his belongings on the conveyor belt in the basket provided. (Id.) He then walked through the metal detector, where Officer Jamie Dunlap proceeded to scan the plaintiff using a hand-held wand. (Id.) Plaintiff explained that he had been through the wanding process with Officer Dunlap "every time I go through the metal detector," and that he had never had a problem. (Id. at 36).

Plaintiff described the procedure by which the officer scanned him with the wand, requiring plaintiff to raise his arms in the air. (Id. at 27–28). Mr. Cunningham claims that after Officer Dunlap had completed the wanding process and Mr. Cunningham had produced his

---

[3]Although he claimed that he had taken his medications on August 7, 2002, the VA Hospital records contain a notation that he did not take his insulin that morning. (Tr. at 117).

[4]Plaintiff testified that prior to the date of the incident, he had never seen Flores before. (Id. at 37).

identification for the officer, Officer Flores approached, yelling at Mr. Cunningham and at Officer Dunlap. (Id. at 28).

According to plaintiff, Officer Flores told Officer Dunlap that he was "not finished with this guy," and demanded to see Mr. Cunningham's "goddamn ID again . . . ." (Id.) Plaintiff testified that although he showed his identification to Officer Flores and pleaded to be let go, Officer Flores told plaintiff to "shut up" and instructed Officer Dunlop to "wand" the plaintiff again. (Id.) Mr. Cunningham testified that after he raised his arms to be wanded, Officer Flores grabbed plaintiff's identification, put his hand over Officer Dunlop's, and proceeded to wand plaintiff again. (Id. at 28–29).

After Officer Flores completed the wanding process, plaintiff began to proceed to his group, but Officer Flores grabbed plaintiff, and threw him to the ground. (Id.) Mr. Cunningham claims that Officer Flores, along with four or five officers, dragged him face down across the floor to the information desk, where he was slammed head first into the desk. (Id. at 29, 46-49). Two of the officers got on top of plaintiff, and one had his knee in Mr. Cunningham's back. (Id.) Plaintiff claims that he started to panic because he had no idea why the officers were doing this. (Id.) According to plaintiff, one officer was putting so much pressure on his neck that he could not scream. (Id. at 48-49). At one point, plaintiff asserts that the officers handcuffed him, warning that he would be arrested if he did not shut up. (Id. at 29). He was eventually taken to the Security Office in the VA hospital, where he was then shackled to hooks on the wall for 45 minutes to an hour. (Id. at 30-34).

Plaintiff claims that while he was in the Security Office, four other officers came by and laughed at him. (Id. at 30). Despite the fact that he told the officers that he felt like his blood

sugar level was either elevated or low, the officers would not remove him from the wall.  (Id. at 30-31).  Finally, the supervisor took him off the hook, removed his handcuffs, and had him taken to the emergency room.  (Id. at 30).  There he was held for two or more hours cuffed to the bed. (Id. at 39).  His blood sugar was tested, he was treated with insulin, and given something to eat. (Id. at 38-39).  While in the emergency room, plaintiff claims that he asked to see his therapist. (Id. at 38).  Another therapist came to see plaintiff, but plaintiff claims that he was "very distraught" and "mentally dazed."  (Id. at 38-39).

When he was released from the emergency room, he was taken back to the security office where the supervisor told Mr. Cunningham that he was going to be given a couple of tickets.  (Id. at 39-40).  Plaintiff, however, refused to leave and demanded that Officer Flores be arrested.  (Id. at 40).  When the officers refused to arrest Officer Flores, plaintiff asked them to call his therapist.  (Id.)  Again, they refused.  (Id.)  At some point, around 5:00 or 5:30 in the evening, plaintiff's counselor, "Evelyn Glassmere,"[5] saw the plaintiff through the security office window as she was leaving to go home.  (Id. at 40-41).  Plaintiff explained what had happened and she took plaintiff upstairs to the director's office to file a complaint.  (Id. at 41-42).  Ms. Glassmere then accompanied plaintiff to the bus and his sister met him near his home.  (Id. at 44-45).

On cross-examination, plaintiff initially admitted that he was diagnosed with "schizo-effective disorder[-]bipolar" in 1998.  (Id. at 92).  However, he later disputed whether he had been diagnosed with this illness, and he disputed the accuracy of certain medical records shown

---

[5]Although not entirely clear from the testimony, it appears that plaintiff was referring to his counselor, Elizabeth Giasemedes.

to him that stated that in 1998 he was "hearing voices." (See id. at 93-95, 97; Gvt's Ex. A).[6]  He

attempted to explain his prior deposition testimony that "[m]y symptoms of schizophrenia may

be a disease of hearing voices. . . I constantly all my life heard voices and I just lived with it."

(Id. at 93-94).  Instead, at trial, he claimed that he was not hearing voices, but that he had certain

"thoughts." (Id. at 95).  He was inconsistent about whether or not he had experienced

depression in the past (see id. at 101), and claimed that although he attended anger management

programs, he had never been violent.[7]  Moreover, when he claimed that he took his medications

every day, counsel showed him records indicating that in March 2002, he had not taken his

medications because he was depressed and isolated himself for a significant period of time.  (Id.

at 112-113).  At trial, Mr. Cunningham sometimes denied having any history of drug use.  (Id. at

137).  However, medical records admitted into evidence document that he abused alcohol and

drugs.  (Id. at 427).


B.     Testimony of Officer Henry Flores

Officer Henry Flores, who was forty years old at the time of trial, testified that on the date

of the incident in question, he had been working for the VA for approximately two years.  (Id. at

228-229).  Prior to his employment with the VA, Officer Flores had been a police officer in

various New York State and New York City positions for about twelve years.  (Id. at 229).  He

---

[6]Citations to "Gvt's Ex." refer to the exhibits presented by the government at trial.

[7]He then stated that he could not recall altercations referenced in staff notes by Mr.
Cunningham's counselors.  (Tr. at 104; Gvt's Ex. A).

has a high school diploma and completed one year of college at John Jay College of Criminal Justice. (Id.) When he began working for the VA, he received training at the police academy, including training in "verbal judo."[8] (Id. at 230-231). His duties on the day of the incident included overseeing the private security guards who were monitoring the entrances and exits and at the metal detectors. (Id. at 230).

Officer Flores testified that he became aware of Mr. Cunningham on the morning of August 7, 2002 at approximately 10:40 a.m. (Id. at 177-78, 181). Officer Flores testified that when he "heard [Mr. Cunningham] on the line, he seemed agitated. He was cursing and complaining about having to empty his pockets." (Id. at 231). When asked to characterize his demeanor, Officer Flores stated that Mr. Cunningham "was very upset. Loud, boisterous . . . [and] using profanity." (Id.) Mr. Cunningham's agitation appeared to Officer Flores to be directed "at the entire VA and then [at] the security officer, Dunlap, and then eventually to me." (Id.) Officer Flores testified that from his vantage point by the main entrance to the hospital lobby, he heard and saw Officer Dunlap attempt to explain to Mr. Cunningham that it was hospital procedure that everyone had to empty their pockets, to which plaintiff responded, "I am a veteran," and that "this is a fucked-up procedure." (Id. at 182).

According to Officer Flores, Officer Dunlap called him over after ten or fifteen seconds and said, "'Mr. Flores, I'm having a problem with this man.'" (Id. at 186 (quoting from Officer

<hr />

[8]Officer Flores explained that the term "verbal judo" refers to "a form of communication [used to try to] calm someone down who may be a little irate, talking in a lower tone, trying to bring them to the lower register that you're at, constantly trying to keep them from being loud and agitated. . . . Usually, if they see you using the lower down motion [with your hands], it's sort of like a signal to calm down and also to protect yourself in the event that they don't calm down." (Tr. at 230–31).

Flores' Deposition Transcript ("Flores Dep. Tr.") at 33); see also Tr. at 183). Officer Flores then asked Mr. Cunningham what the problem was, to which Mr. Cunningham responded, "'This is bullshit,'" and that he did not feel that he had to empty his pockets. (Id. at 183). Officer Flores testified that he told Mr. Cunningham that emptying his pockets was VA policy (id. at 184), and he "tried to basically explain to him why people come through the metal detectors and why they have to empty their pockets, it's part of the procedure we have at VA." (Id. at 235). Mr. Cunningham responded that he did not like the way Officer Dunlap was talking to him. (Id. at 184). Officer Flores told Mr. Cunningham to cease his behavior or he would receive a summons for disorderly conduct. (Id. at 184, 187; Flores Dep. Tr. at 33). According to Officer Flores, Mr. Cunningham responded that Flores "wasn't going to do shit to him because he was a veteran." (Tr. at 185, 187; Flores Dep. Tr. at 33).

The officer explained that Mr. Cunningham was very "agitated[,] using a lot of profane language and causing a disturbance in a federal facility." (Tr. at 235). He testified that he "was continually trying to get [Mr. Cunningham] to lower his voice and keep himself calm" by using "verbal judo" techniques. (Id.) According to Officer Flores, Mr. Cunningham "became hostile towards [Officer Flores] and verbally abused [him] as well." (Id. at 235-36).

After this verbal exchange, Mr. Cunningham passed through the metal detector and then walked to the table of the conveyor belt to retrieve his things, while continuing to curse "in a very loud tone." (Id. at 188). Officer Flores said, "sir, this is your final warning. . . . [y]ou are going to have to stop your behavior; otherwise you will be issued a citation for disorderly conduct." (Id. at 191; Flores Dep. Tr. at 35). Mr. Cunningham responded, "'[f]uck you, you are not arresting shit.'" (Tr. at 188; Flores Dep. Tr. at 35). Officer Flores told Mr. Cunningham that he

8

was under arrest for disorderly conduct. (Tr. at 189). At that point, Flores testified that "Mr. Cunningham spun around"[9] approximately 45 degrees to face Officer Flores directly and went into what appeared to be a combative stance. (Id. at 189-191, 201). Mr. Cunningham's left hand was out "in a combative position . . . it appear[ed] to be a karate stance," and his right hand was clenched and elevated in the air. (Id. at 191, 192; Flores Dep. Tr. at 35). Flores described Mr. Cunningham's left leg as being forward and his right leg as back when he "lunged" at Officer Flores. (Id. at 191, 202; Flores Dep. Tr. at 35). At that point, Officer Flores felt threatened and "grabbed Mr. Cunningham by his arms to restrain Mr. Cunningham from striking [Officer Flores]." (Tr. at 191, 202). Officer Flores testified that when he tried to restrain Mr. Cunningham, they "fell off balance," and that Mr. Cunningham then "dropped himself to the ground."[10] (Id. at 203). He thought that Mr. Cunningham's intent in dropping to the ground

_____

[9]Plaintiff attempted to impeach Officer Flores' testimony at trial by showing him the videotape of the incident and asking the officer to identify where on the tape he observed Mr. Cunningham "spinning around." (Tr. at 219-225). Although the officer had previously testified at his deposition that he clearly saw an image of Mr. Cunningham spinning around, at trial, when shown the frame by frame images, the officer could not identify this action and he testified that he did not recall if he had actually seen the image on the videotape before. (Id. at 225). It is possible that Officer Flores perceived the plaintiff's action as "spinning around" but that the actual image was not captured on the videotape because the videotape was not a continuous recording of what occurred at the time of the incident, but rather frames of images with several seconds of delay in between. (Id. at 223).

[10]At trial, plaintiff attempted to impeach Officer Flores' credibility by pointing to discrepancies between his trial testimony and the incident report that Officer Flores filled out after the incident. In particular, plaintiff pointed to deposition testimony by Officer Flores that Mr. Cunningham "resisted [his] efforts [to restrain him] and continued to struggle." (Id. at 204). Officer Flores explained that the "struggling part was when [they] fell off balance." (Id.) The full text of the disputed portion of the incident report reads: "I attempted to restrain the subject by grabbing his arm and placing him on the floor. The subject resisted my efforts and continued to struggle. I then used minimal force in order to effect the arrest. . ." (Id. at 237). In the Court's reading of this passage, it appears that Officer Flores placed Mr. Cunningham on the floor, and after this point Mr. Cunningham continued to struggle. This reading is consistent with the

might have been to try to escape his grip, and that Mr. Cunningham might try to attack him once he dropped to the ground and broke Officer Flores' grip on him. (Id. at 204) Thus, Officer Flores dropped down to the ground on one knee while Mr. Cunningham was lying flat out, full body length on his stomach. (Id. at 204-05). When Officer Flores attempted to restrain Mr. Cunningham in order to handcuff him, Mr. Cunningham attempted to crawl away. (Id. at 205–06).

Officer Flores testified that "[a]fter [Mr. Cunningham] dropped to the ground, he started kicking and crawling across the floor and just screaming in a loud tone, screaming for help and [being] irrational." (Id. at 205, 232). According to Officer Flores, Mr. Cunningham crawled several feet to the information desk, with Flores holding on to Mr. Cunningham's arms in an effort to subdue him. (Id. at 206). The officer did not want Mr. Cunningham to hurt himself or anyone else, so he tried to shuffle with Mr. Cunningham while attempting to grab his triceps. (Id. at 233-34).

Officer Flores reported that several other officers, including Sergeant Agosto, Officer Ramadhin, and Police Officers Kent, Gabriel, and Austin responded to the scene and assisted Flores in placing the handcuffs on Mr. Cunningham, who Flores described as "combative and violent." (Id. at 237). After he was placed in handcuffs, Mr. Cunningham was taken to police operations where he "became abusive to Police Officer Ramadhin and [Officer Flores]." (Id.)

On August 2, 2002, Officer Flores filed a Uniform Offense Report, which indicates that Mr. Cunningham was arrested and charged with Disorderly Conduct, in violation of 38 C.F.R. § 1.218(b)(11), and with Failure to Comply with an Officer's Directives, in violation of 38 C.F.R.

---

testimony of Officers Flores and Dunlap.

§ 1.218(b)(24). Both charges were dropped pursuant to an Adjournment in Contemplation of Dismissal dated January 29, 2002. (Compl. ¶ 23).

C.    Testimony of Brenda Torres

Brenda Torres, an employee of the Brooklyn VA Hospital for fifteen years, was a witness to the incident in question. (Tr. at 246-247). She testified that on the morning of August 7, 2002, when she entered the building lobby, she saw Mr. Cunningham in the security area in front of the main entrance, by the conveyor belt, yelling at the private security officer.[11] (Id. at 247, 252, 253). She then walked away. (Id. at 248). Later that morning, following the incident, Officer Flores approached Ms. Torres and inquired as to whether she had witnessed the incident. (Id. at 261). When she replied affirmatively, he asked if she would be willing to write a statement describing what she had seen. (Id.) The day after the incident, she wrote a statement, describing what she had observed, and took it to the security office where she gave it to Officer Flores, who returned a copy to her. (Id. at 249, 258-59, 262). In her statement, she reported as follows:

> August 7, 2002 at approximately 10:45 a.m., while re-entering the BK campus from my break, I observed a male black approximately six feet, 200 pounds, yelling and screaming at the security guard. At that point Police Officer Flores walked toward the man to ask him what was going on. The man then took what appeared to be a karate stand toward Police Officer Flores, who quickly took a step back away from the man. Man then stepped toward Police Officer Flores, who then grabbed him and arrested him. Police Officer Flores did the right thing. At no point was Police Officer Flores a threat to this man. He only asked him a question.

---

[11]Although she could not identify the officer by name, Ms. Torres testified that he was white, which suggests that she was referring to Officer Dunlap, who is white. (Id. at 253).

(Id. at 249–50; Gvt. Ex. B). Ms. Torres testified that she does not know Officer Flores and that she has no reason to be biased in her testimony about her observations (id. at 251), and that Officer Flores did not tell her what to write in her statement, other than "to write what I saw." (Id. at 260). She additionally testified that her statement was accurate at the time she wrote it because the incident was fresh in her mind. (Id. at 258).[12]


D.     Testimony of Officer Jamie Dunlap

On the morning of August 7, 2002, Officer Jamie Dunlap was working at the metal detector security post in the main entrance lobby, operating the x-ray machine. (Id. at 266; Pl's. Ex. 4). When Officer Dunlap first witnessed Mr. Cunningham, Mr. Cunningham was preparing to go through the metal detector, but he had an angry expression on his face, and was grumbling and cursing under his breath. (Id. at 272, 327, 341). According to Officer Dunlap, Mr. Cunningham began removing objects from his pockets "in a bad manner," "like he didn't want to put [them] in the basket," but, according to Officer Dunlap, Mr. Cunningham did not resist emptying his pockets. (Id. at 272). Officer Dunlap testified that at that time, Officer Flores was standing on the other side of the x-ray machine and Officer Dunlap identified Officer Flores on the videotape. (Id. at 277-278).

After emptying his pockets, Mr. Cunningham went through and set off the metal detector. (Id. at 327). When Officer Dunlap asked Mr. Cunningham to check his pockets again and then go back through the metal detector, Mr. Cunningham continued to curse. (Id. at 273, 328, 337-

---

[12]Apart from recalling that Mr. Cunningham was yelling at the officer and asserting that her written statement was accurate when written, Ms. Torres had no independent recollection of the incident at the time of trial.

341). He proceeded through a second time, again setting off the metal detector. (Id. at 273, 328). Officer Dunlap testified that because this triggered a mandatory search, he was required to search Mr. Cunningham. (Id. at 273, 294, 328). Officer Dunlap testified that as he started to search Mr. Cunningham with the wand, Mr. Cunningham's hands were at his sides and not over his head. (Id. at 328). While Officer Dunlap was in the process of wanding Mr. Cunningham, plaintiff continued to yell and curse at Officer Dunlap. (Id. at 329). The officer testified that plaintiff was "like real close to me in my face." (Id. at 273, 329). At this point, according to Officer Dunlap, plaintiff made a motion like a "flinch" which led the officer to feel threatened and to fear that plaintiff was going to hit him. (Id. at 329, 330, 347). However, according to Officer Dunlap, up to this point, he had not had any discussion with Mr. Cunningham. (Id. at 281). The officer also denied saying anything to Officer Flores up to this point, but he testified that he "maybe gave [Officer Flores] a look at that point in time." (Id.)

After Officer Dunlap proceeded to search Mr. Cunningham with the wand (id. at 280), Officer Flores came over to assist Officer Dunlap and told Mr. Cunningham to calm down. (Id. at 330). He also asked Officer Dunlap to wand Mr. Cunningham again, which he did. (Id. at 283). While he was doing this, Officer Dunlap testified that Mr. Cunningham was "mumbling words but [Officer Dunlap could not] recall what the words were." (Id. at 284). Officer Dunlap then turned away to return the baskets to the other side of the metal detector. (Id. at 286-287). Officer Dunlap then heard Officer Flores telling Mr. Cunningham to calm down because he was being loud. (Id. at 288). Mr. Cunningham replied, "Get the fuck out of my face. Leave me alone, I ain't do nothing." (Id. at 292). Officer Flores then told Mr. Cunningham that he was going to arrest him for disorderly conduct. (Id. at 288). Officer Dunlap turned and saw Officer

Flores reaching out to grab Mr. Cunningham so that he could arrest him. (Id.) He saw Mr. Cunningham in an aggressive stance with his right arm cocked back and his hand in a fist above his head. (Id. at 289)

Officer Dunlap testified that "Mr. Cunningham told Officer Flores, 'Don't touch me. Get off me.' Then, as Officer Flores tried to arrest Mr. Cunningham, they started . . . tussling around." (Id. at 289). They wrestled over and around the conveyor belt as Officer Flores attempted to arrest Mr. Cunningham. (Id. at 297–98). As he viewed the videotape, the witness testified that Officer Flores and the plaintiff tripped over each other, landing on the ground. (Id. at 322). According to the witness, Mr. Cunningham was "struggling to get away from Officer Flores" (id. at 322), and the officer grabbed Mr. Cunningham and put him on the floor. (Id. at 298). Mr. Cunningham was asking, "Why you do this? I didn't do nothing, get off of me." (Id. at 299). Officer Flores called for back-up as he struggled to handcuff Mr. Cunningham. (Id. at 303). According to Officer Dunlap, plaintiff was resisting Officer Flores' efforts to restrain him, trying to crawl away. (Id. at 332). He continued to struggle all the way to the information desk at which time other officers came to assist. (Id. at 333). Once they had subdued him, they brought Mr. Cunningham to the holding room. (Id. at 334). Officer Dunlap testified that he did not see anyone hit or kick Mr. Cunningham while he was at the information desk. (Id.)

At the end of his shift on August 7, 2002, Officer Dunlap prepared a witness statement which he handed to Sergeant Agosto, the sergeant on duty. (Id. at 308; Pl.'s Ex. 4). In Officer Dunlap's statement, he wrote that when Mr. Cunningham became verbally abusive towards Officer Flores; "[t]he officer asked him numerous times to calm down. [Mr. Cunningham] took a stance, the officer stated to him he was under arrest for disorderly conduct. He raised his hand

so Flores took him down for his safety and others after he slightly resisted." (Tr. at 309; Pl.'s Ex. 4).

In his deposition, Officer Dunlap had testified that when Mr. Cunningham raised his hand toward Officer Flores, he thought that Mr. Cunningham was raising his hand to put his glasses back on. (Id. at 313).[13] On cross examination at trial, however, Officer Dunlap retracted his testimony that Mr. Cunningham was putting his glasses on, and stated that he thought that Mr. Cunningham had his hand raised in a fist and was about to hit Officer Flores. (Id. at 331).

E.    Testimony of Dr. Stanley Portnow[14]

Dr. Stanley Portnow, who was certified as an expert by the Court in the field of forensic psychiatry (id. at 353), examined Mr. Cunningham on April 13, 2005 and April 28, 2005. (Id. at 354). In connection with his expert report, he reviewed approximately 500 pages of hospital records and information obtained from other sources relating to Mr. Cunningham. (Id. at 363). He was not, however, provided with, nor did he review, Mr. Cunningham's records of his stay at the VA Hospital in Canandigua, New York, where Mr. Cunningham was allegedly diagnosed with bipolar disorder, schizophrenia, and treated with Haldol. (Id. at 358). Dr. Portnow also did not review the transcripts of the depositions of any of the other witnesses, or watch the videotape

---

[13]The officer testified that when he had been deposed, "[his] mind was not focused. . . I wasn't lying like initially, I [was] just saying things that I'm not sure of because, at that time, I really didn't want to be there. . . ." (Id. at 315).

[14]Plaintiff and defendant called a number of witnesses who addressed, among other things, plaintiff's alleged damages arising from the incident in question. Since this Court finds that defendant is not liable, the issue of damages has not been addressed and the testimony of these witnesses as it relates to damages is also not discussed in this Memorandum and Order.

of the incident. (Id. at 377).

Based upon his examination of Mr. Cunningham and his review of the other materials, Dr. Portnow concluded that Mr. Cunningham "developed an acute stress [disorder], and an exacerbation of his pre-existing post-traumatic stress disorder"[15] as a result of the incident at the VA Hospital on August 7, 2002. (Id. at 363). On cross-examination, Dr. Portnow acknowledged that Mr. Cunningham was not always compliant with taking his medications and that when he does not take them, his psychiatric symptoms become worse. (Id. at 393). He also conceded that Mr. Cunningham had suffered in the past from paranoid ideation which can manifest itself in suspiciousness or a tendency to find hidden or special meanings in things. (Id. at 386). The doctor admitted that people suffering from paranoid ideation may perceive an event in a distorted fashion. (Id. at 388). When shown notations in the records indicating that Mr. Cunningham historically believed that people were talking about him,[16] the doctor admitted that he had not been aware of these records. (Id. at 397-399, Ex. A66, A496).

Dr. Portnow testified that Mr. Cunningham's "thought processes were very loose and somewhat circumstantial," which "can give rise to the impression that someone is not terribly credible." (Id. at 361–62). However, Dr. Portnow opined that Mr. Cunningham's loose thought

_____

[15]The doctor testified that Mr. Cunningham had developed post-traumatic stress disorder ("PTSD") as a result of childhood sexual abuse. (Tr. at 404).

[16]The records of Dr. Tershakovec indicate that plaintiff complained of "auditory hallucinations almost every day and feelings that people were talking about this. . . ." (Tr. at 398, Ex. A46). Other records indicate that plaintiff "report[ed] life-long depression, suicidal thoughts. . . . He says he has 'always been paranoid,' i.e. sensitive to the belief that others are noticing him or talking about him." (Tr. at 399, A496). Dr. Portnow testified that he did not recall seeing these records. (Tr. at 401).

16

associations[17] were the result of his bipolar disorder and schizophrenia, rather than of lying or malingering.[18] (Id. at 362). Although Dr. Portnow found that Mr. Cunningham was "a little paranoid at times," he did not witness anything that he "could really call delusional." (Id.)

F.  Testimony of Dr. Stuart Kleinman

Defendants called Dr. Stuart Kleinman as an expert witness. Dr. Kleinman is a board-certified psychiatrist with sub-specialties in forensic psychiatry and traumatic stress who has been practicing since 1983. (Id. at 434–35). At the request of the government, Dr. Kleinman conducted an examination of Mr. Cunningham on December 28, 2004, for approximately six hours. (Id. at 446). In addition, he reviewed Mr. Cunningham's medical records, including those from the VA Hospitals in Breckville and Canadiagua, as well as the federal complaint in this action, various deposition transcripts, and the videotape of the incident. (Id. at 447–48). Dr. Kleinman also interviewed Dr. Mirza, Mr. Cunningham's long-term treating psychiatrist at the Brooklyn VA. (Id. at 448).

Dr. Kleinman concluded to a reasonable degree of medical and psychiatric certainty that Mr. Cunningham "had a number of significant disorders prior to August 7, 2002," including schizoaffective disorder - bipolar type, chronic post-traumatic stress disorder, significant narcissistic, borderline, histrionic personality features, a history of substance abuse, and

---

[17]Dr. Portnow defined 'loose associations' as "a thought process" where "you can't make the connection between what was previously said and what was next said, so that the connection is loose." (Id. at 381).

[18]Dr. Portnow agreed with defense counsel's definition of 'malingering' as "deliberate or conscious simulation of symptoms, disorders or incapacities that are not authentic." (Id. at 379).

pathological gambling. (Id. at 451–55). Mr. Cunningham experienced symptoms including "auditory [command] hallucinations fluctuating in presence and intensity; depression; episodes of significant depression probably superimposed upon chronic low-grade depression. . . . Additionally, manic episodes, and . . . overt paranoid delusions." (Id. at 452). The doctor also found that Mr. Cunningham experienced post-traumatic stress disorder symptoms of "thoughts, images, nightmares, [and] flashbacks. . . . He also suffered fluctuating levels of avoidant symptomatology which could include, for example, isolating himself; having diminished interest in activities; having difficulty withdrawing; attachments to others; and hyperarousal."[19] According to Dr. Kleinman, Mr. Cunningham's personality features manifested themselves in "a long-standing hypersensitivity to feeling rejected or diminished. [He had a] chronic feeling of depressive emptiness, and by history, really a long history of impulsivity." (Id. at 454).

Dr. Kleinman opined that Mr. Cunningham's schizoaffective disorder, PTSD, and personality features each "dispose Mr. Cunningham to hypersensitivity . . . to either distortedly perceive or exaggeratedly respond to interpersonal encounters." (Id. at 456). The schizoaffective disorder would dispose Mr. Cunningham to "misunderstand [his] circumstances" and "find maliciousness in others' actions." (Id. at 456–57). His PTSD led him to have "particular sensitivity as an adult to certain kinds of authority figures." (Id. at 458). His narcissistic traits suggest that he is "much more susceptible to feeling particularly hurt and particularly angry in response to being or perceiving feeling insulted, such that sometimes they may exhibit . . .

---

[19]Dr. Kleinman defined 'hyperarousal' as when "the nervous system, the body, is excessively primed for anticipated threat. . . . [I]t could be difficult to concentrate; it could be difficult to sleep. If one has a hyperadrenaline type of state, it's hard to relax and one would have these kinds of symptoms." (Id. at 453).

tremendous and at times an inordinate level of rage [in response] to feeling dissed." (Id. at 459).

Finally, Dr. Kleinman noted that Mr. Cunningham's psychiatrist had changed plaintiff's psychiatric medication on July 29, 2002, a little more than a week before the incident in question, to address symptoms of paranoid ideation. (Id. at 461). Although it was not established whether Mr. Cunningham took his medication on the morning of August 7, 2002, Dr. Kleinman opined that if Mr. Cunningham had failed to take his medication, it "might have increased the likelihood of his either distortedly perceiving or exaggeratedly responding to whatever encounter he had. . . ." (Id.) He testified that "although Mr. Cunningham may not necessarily accurately recall this, . . . there have been times in which he clearly has been noncompliant with both psychiatric medication as well as diabetic medication. And the records too at times indicate a correlation between not being compliant . . . and deterioration or worsening of his mental state." (Id. at 460). Dr. Kleinman concluded that "there is a substantive psychiatric basis for reasonably questioning whether or to what extent Mr. Cunningham accurately perceived what occurred on August 7, 2002, and whether or to what extent, he proportionately or disproportionately responded to [the officers] in a verbal way or a physical way. . . ." (Id. at 461).

G.  Testimony of Counselor Elizabeth Giasemedis

Elizabeth Giasemedis works as a staff nurse and certified alcohol substance abuse counselor at the VA, where she was Mr. Cunningham's counselor in the transitions group of the Ambulatory Substance Abuse Program ("ASAP"). (Id. at 613–18). She testified that Mr. Cunningham sometimes forgot to take his medication. (Id. at 620–21). On the day of the

19

incident, she received a call from the patient representative's office asking her to come see Mr. Cunningham because he was crying and very upset. (Id. at 622). She went to see him, heard his story of what happened, and escorted him to the eye clinic to have his broken glasses fixed. (Id. at 622–23).


## DISCUSSION

A.  The Federal Tort Claims Act

Plaintiff brings this claim under the Federal Tort Claims Act (the "FTCA") 28 U.S.C. § 2671–2680. Under the FTCA, a federal employee acting within the scope of employment is absolutely immune from a suit for damages based on negligent or wrongful conduct that constitutes common-law tort. See Rivera v. United States, 928 F.2d 592, 608 (2d Cir. 1991); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 509–510 (2d Cir. 1994). This does not mean that a claimant is deprived of a remedy, see Rivera v. United States, 928 F.2d at 609; rather, "a claimant's exclusive remedy for nonconstitutional torts by a government employee acting within the scope of his [or her] employment is a suit against the government under the FTCA." Castro v. United States, 34 F.3d 106, 110 (2d Cir. 1994). Under Section 2674, the United States is liable for any tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; see Castro v. United States, 34 F.3d at 111. Thus, under the FTCA, the United States may be held liable for money damages for the torts committed by its employees while acting within the scope of their office or employment. 28 U.S.C. § 1346(b)(1).

In this case, plaintiff seeks damages from the United States allegedly suffered as a result

20

of an assault and battery which plaintiff claims occurred at the VA Hospital on August 7, 2002. Although the FTCA generally prohibits claims of assault and battery against the government, the FTCA explicitly provides that "with regard to acts or omissions of investigative or law enforcement officers[20] of the United States Government, . . . any claim arising . . . out of assault, [or] battery" is permitted." 28 U.S.C. § 2680(h); see Cuoco v. U.S. Bureau of Prisons, No. 98 CV 9009, 2003 WL 22203727, at *4 (S.D.N.Y. Sept. 22, 2003) (providing that "[a]lthough assault and battery claims against the federal government are usually prohibited, the FTCA permits such claims where, as here, federal law enforcement officers are alleged to have committed assault or battery"). In this case, the law enforcement officers who allegedly assaulted plaintiff were employed as security officers for the Department of Veteran Affairs ("VA"), a department of defendant United States of America. (Compl. ¶¶ 3, 4). For purposes of the FTCA, VA police officers are federal law enforcement officers. See Celestine v. United States, 841 F.2d 851, 852–853 (8th Cir.1988); see also Stewart v. United States, No. 03 CV 1404, 2005 WL 1903318, at *2 (D.D.C. July 13, 2005). Thus, under the FTCA, the United States may be held liable for money damages for the torts of assault and battery if committed by its employees while acting within the scope of their office or employment. 28 U.S.C. § 1346(b)(1).

Plaintiff alleges that the defendant security officers acted within the scope and course of their employment and on behalf of defendant United States of America, in their capacities as federal law enforcement officers and/or private security officers employed by the VA. (Compl. ¶

---

[20]"Investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

5). Here, there is no dispute that Officer Flores and the other VA police security personnel involved in the incident were acting within the scope of their employment as federal law enforcement officers and/or private security officers employed by the VA.


B.    Assault and Battery

In order to determine the elements necessary to establish liability for any particular tortious act in cases brought under the FTCA, the court must look to "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); see also Lambertson v. United States, 528 F.2d 441, 443 (2d Cir.), cert. denied, 426 U.S. 921 (1976).   Since the incident in this case occurred at the VA Hospital in Brooklyn, the Court looks to New York law to evaluate the government's conduct. Thus, the issue presented is whether the actions of the VA security officers would give rise to liability for assault and battery under the elements of New York State law.

In Girden v. Sandals International, the Second Circuit defined "assault" under New York law as "an intentional placing of another person in fear of imminent harmful or offensive conduct." 262 F.3d 195, 203 (2d Cir. 2001) (citation omitted); see also Merzon v. County of Suffolk, 767 F. Supp. 432, 448 (E.D.N.Y. 1991) (stating that a "civil 'assault' is the intentional placing of another in apprehension of imminent harmful or offensive contact"). While "actual contact is not required, there must be some manifestation that creates reasonable apprehension of harmful physical contact." Collum v. Incorporated Village of Freeport, N.Y., 691 F. Supp. 637, 641 (E.D.N.Y. 1988).

22

A "battery" is defined under New York law as "an intentional wrongful physical contact with another person without consent." Girden v. Sandals International, 262 F.3d at 203; see Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348 (2d Cir. 2004) (same); see also Lambertson v. United States, 528 F.2d 441, 444 (2d Cir. 1976) (stating that "the intent which is an essential element of the action for battery is the intent to make contact, not to do injury"). In order to recover damages for battery, a plaintiff must "'prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.'" Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 341, 665 N.Y.S.2d 440, 440 (2d Dep't 1997) (citation omitted); see also Merzon v. County of Suffolk, 767 F. Supp. at 448 (stating that "[t]he elements of a civil 'battery' [under New York law] are: (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent").

An assault and battery occurs "when a person is placed in imminent apprehension of harmful or offensive bodily contact and there is an actual use of force." Cohen v. Davis, 926 F. Supp. 399, 402 (S.D.N.Y. 1996) (citing 6 N.Y. Jur. 2d § 1). Plaintiff has established that he was in "imminent apprehension" that the officers would engage in conduct that would result in offensive bodily contact. It is undisputed in this case that there was actual force used in restraining and arresting Mr. Cunningham. The evidence presented at the trial demonstrated that the bodily contact was offensive in nature. Therefore, plaintiff has established the first two prongs of the test for a battery - - namely, he has proved that there was bodily contact that was offensive in nature.

Plaintiff must also prove that the offensive contact was "made with intent." While the plaintiff must prove intentional contact, he "is not required to prove an intention to cause the

specific injuries resulting from the contact." Masters v. Becker, 22 A.D.2d 118, 120, 254 N.Y.S.2d 633, 635 (2d Dep't 1964); see also Lambertson v. United States, 528 F.2d at 441 (holding that federal employee committed a "battery" when he jumped on plaintiff's back and began to ride plaintiff piggyback, resulting in plaintiff falling and being injured, even though federal employee intended no harm). The contact in this case was unquestionably intentional.

However, where there has been a lawful arrest, intentional contact with the arrested person does not constitute assault and battery, provided such force is reasonable. See, e.g., Lorensen v. State, 249 A.D.2d 762, 671 N.Y.S.2d 790 (3d Dep't 1998) (upholding a finding that force used during a lawful arrest was "no more than necessary" in light of the circumstances); Wyllie v. District Atty. of County of Kings, 2 A.D.3d 714, 770 N.Y.S.2d 110 (2d Dep't 1996) (holding that "State defendants demonstrated their entitlement to summary judgment on the second (assault and battery) cause of action by demonstrating the reasonableness of their conduct in arresting and transporting the plaintiff"). Conversely, when "an arrest is determined to be unlawful, a claim for assault and battery may arise." L.B. v. Town of Chester, 232 F. Supp. 2d 227, 238 (S.D.N.Y. 2002) (citing Sulkowska v. City of New York, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (stating "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest")); see also Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 341, 665 N.Y.S.2d 440, 440–441 (2d Dep't 1997) (holding that where arrest was unlawful, police officer committed a battery when he touched plaintiff during arrest).

Accordingly, it is necessary for this Court to determine whether the arrest of Mr. Cunningham was lawful.

C.     Probable Cause

In determining whether Mr. Cunningham was lawfully arrested, the Court must first

determine whether there was probable cause for the arrest.  Probable cause exists "when the

arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a

person of reasonable caution in the belief that an offense has been committed by the person to be

arrested.'" Dzinanka v. County of Suffolk, 932 F. Supp. 59, 62 (E.D.N.Y. 1996) (quoting

Calamia v. City of N.Y., 879 F.2d 1025, 1032 (2d Cir. 1989)); see also Golino v. New Haven,

950 F.2d 864, 870 (2d Cir. 1991), cert. denied, 505 U.S. 1221 (1992).  The officer need not make

an actual showing of criminal activity, but merely a "probability or substantial chance" that such

activity occurred.  See, e.g., Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983); Labensky v. County

of Nassau, 6 F. Supp. 2d 161, 176 (E.D.N.Y. 1998).  It is also not necessary that the officers

show evidence "'beyond a reasonable doubt,'" as is required for a criminal conviction; "[n]or do

police officers need to demonstrate that it is more probable than not [that] an offense has been

committed to make a prima facie showing of criminal activity."  Miloslawsky v. AES Engin.

Soc'y, Inc., 808 F. Supp. 351, 354 (S.D.N.Y. 1992) (citing United States v. Ginsberg, 758 F.2d

823 (2d Cir. 1985)), aff'd, 993 F.2d 1534 (2d Cir.), cert. denied, 510 U.S. 817 (1993).  Rather, "a

determination of the existence of probable cause 'turns on an objective assessment of the

officer's action in light of the facts and circumstances confronting him at the time.'"  Nazaire v.

City of N.Y., No. 01 CV 7630, 2003 WL 21738607, at *3 (E.D.N.Y. June 26, 2003) (quoting

Maryland v. Macon, 472 U.S. 463, 470 (1985)).

The existence of probable cause is a question of fact when there is a dispute regarding the

events leading to the arrest. See, e.g., Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997);

Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Moore v. Comesanas, 32 F.3d 670, 673 (2d

Cir. 1994). See also Collom v. Inc. Vill. of Freeport, N.Y., 691 F. Supp. 637, 640 (E.D.N.Y.

1988) (noting that "where the evidence is conflicting such that reasonable persons might draw

differing inferences, then the question of probable cause is ordinarily for the jury to decide")

(citations omitted). Probable cause may exist "even where it is based on mistaken information,

so long as the arresting officer acted reasonably and in good faith in relying on that information."

Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (citing Colon v. City of N.Y., 60

N.Y.2d 78, 455 N.E. 2d 1248 (N.Y. 1983)).

Mr. Cunningham was arrested and charged with Disorderly Conduct, 38 C.F.R. §

1.218(b)(11).[21] (Compl. ¶ 22). Disorderly Conduct is defined in the Code of Federal Regulations

as "conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use

of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or

prevent the normal operation of a service or operation of the facility." 38 C.F.R. § 1.218(b)(11).

Violations carry a potential fine of $250.

Having reviewed the videotape and heard the testimony of the witnesses, this Court finds

that there was probable cause for Mr. Cunningham to be detained and arrested for a violation of

38 C.F.R. § 1.218(b)(11). This Court credits the testimony of Officer Dunlap that on the

morning of August 7, 2002, when Mr. Cunningham attempted to pass through the metal detector

---

[21]The Court notes that Mr. Cunningham was also charged with Failure to Comply with an Officer's Directives, 38 C.F.R. § 1.218(b)(24). (Compl. ¶ 22). Failure to Comply with an Officer's Directives is defined in the C.F.R. as "[f]ailure to comply with traffic directions of VA police," and carries a $25 fine. 38 C.F.R. § 1.218(b)(24). There was no evidence presented that Mr. Cunningham failed to comply with traffic directions.

at the Brooklyn VA Hospital, he set off the alarm twice, requiring the officers to conduct a

further search. (Tr. at 273, 327). Rather than quietly comply, the evidence shows that Mr.

Cunningham reacted in an aggressive manner toward the security officers. (Id. at 235, 249-50,

329). Officers Flores and Dunlap both testified credibly that at various times during the incident,

Mr. Cunningham was mumbling under his breath, cursing and eventually becoming loud and

boisterous, yelling at the officers. (See id. at 235, 329). Brenda Torres's report of her

observations that morning confirmed this testimony. (Id. at 249-50). She observed plaintiff by

the conveyor belt, yelling and screaming at the security guard. (Id.) The evidence also shows

that despite the efforts of Officer Flores to de-escalate the interaction with Mr. Cunningham and

to calm him down, Mr. Cunningham would not calm down. (Id. at 235-36, 288). Instead, he

continued to shout and use obscenities towards the officer, and acted in a threatening and

unpredictable manner. (Id.) Not only did Officer Dunlap testify that he felt threatened by Mr.

Cunningham, but witnesses testified that at one point shortly before the struggle on the floor, Mr.

Cunningham took what appeared to be an aggressive stance, described by Officer Flores and

Brenda Torres as a "karate stance." (Id. at 189-91, 201, 249-50, 289). Although the videotape is

not entirely clear, the tape does demonstrate that Mr. Cunningham's arms were raised above his

head. The Court credits not only the testimony of Officer Flores and Ms. Torres as to their

observation of the karate stance, but the Court notes that, according to Officer Dunlap's

testimony, the wanding process does not require that the individual raise his hands in this

manner.[22] (Id. at 326). Under these circumstances, where Mr. Cunningham was acting in an

_____

[22]Although Officer Dunlap's testimony at trial was not entirely consistent with that of the
other witnesses or with his own prior deposition testimony, the Court credits certain of his
statements. Thus, although he originally testified after the incident that he believed Mr.

erratic manner, cursing and yelling at the officers in a loud and boisterous manner, the Court finds that there was probable cause to arrest the plaintiff.

Other courts have affirmed arrests and conviction under similar circumstances. See, e.g., United States v. Green, 28 F.3d 109 (9th Cir. 1994) (affirming conviction of VA patient for disorderly conduct under 38 C.F.R. § 1.218(b)(11) where he "was, by all accounts, boisterous and abusive before he was restrained or charged. Evidence of his conduct amply supports his conviction"). Accordingly, the Court finds that there was probable cause for plaintiff's arrest.

D.    Excessive Force

Once it has been determined that there was probable cause for arrest, the question before the court becomes whether the force used to effectuate the arrest was excessive. See Bennet v. New York City Housing Authority, 245 A.D.2d 254, 255, 665 N.Y.S.2d 91 (2d Dep't 1997); Akande v. City of N.Y., 275 A.D.2d 671, 672, 713 N.Y.S.2d 341, 343 (1st Dep't 2000) (stating "[t]here having been probable cause for the arrest, the cause of action for battery was also properly dismissed without submission to the jury absent any evidence that the force used to effect the arrest was excessive"); Santiago v. City of N.Y., No. 00 CV 7161, 2002 WL 484139, at *3 n.6 (N.Y. Sup. Feb. 26, 2002) (noting that "irrespective of the existence of probable cause, other causes of action interposed by the plaintiff, such as assault and battery based on the use of

---

Cunningham was putting on his glasses when he raised his hands in the air (Tr. at 311-13), the Court, after viewing the videotape, finds that testimony not to be credible, particularly given his repudiation of this earlier statement at trial by testifying that he believed that Mr. Cunningham was going to hit Officer Flores. (Id. at 331). However, the Court does credit the officer's testimony regarding his observations of Mr. Cunningham prior to the confrontation with Officer Flores, as well as his testimony regarding the procedures used in searching individuals as they pass through the security checkpoints at the VA. (Id. at 326).

excessive force, are not precluded"). If the force used against plaintiff was more than necessary under all the circumstances, then plaintiff is entitled to recover. See Hinton v. City of N.Y., 13 A.D.2d 475, 212 N.Y.S.2d 97 (1st Dep't 1961) (affirming an award of damages where plaintiff, while being lawfully arrested, was struck by several police officers); Jones v. State, 33 N.Y.2d 275, 307 N.E.2d 236 (N.Y. 1973) (generally); see also Pastre v. Weber, 717 F. Supp. 992, 994-995 (S.D.N.Y. 1989) (holding that state trooper used excessive force under Section 1983 in making arrest where trooper vented anger by striking arrestee on head, arms and ribs, and by kicking arrestee in groin while he was lying on his stomach).

The parties here disagree about the degree of force that was used to arrest Mr. Cunningham. Mr. Cunningham alleges that Officer Flores grabbed him, threw him to the floor, and then, with two other officers, dragged him across the floor and slammed him into the information desk. (Tr. at 29, 46-49). By contrast, Officer Flores testified that when he attempted to restrain Mr. Cunningham, they together fell off balance onto the floor, where Mr. Cunningham attempted to crawl away. (Id. at 203–05). Mr. Cunningham then "started kicking and crawling across the floor" and was "combative and violent." (Id. at 205, 237). As a result, Officer Flores required the assistance of other officers to restrain Mr. Cunningham. (Id. at 232, 237). The Court, having heard the testimony of the witnesses, credits Officer Flores' testimony, which is substantiated by the testimony of the other VA officer and employee witnesses, and concludes that Officer Flores used appropriate force to restrain Mr. Cunningham.

Mr. Cunningham testified that the day of the incident was "the first time [he had] ever seen Officer Flores." (Id. at 37). Thus, the Court concludes that Mr. Cunningham's arrest was not influenced by a prior relationship, interaction or grudge held by the officer. See Dietz v.

29

Damas, 932 F. Supp. 431, 455 (E.D.N.Y. 1996) (noting that "'[a] guard is not just any eyewitness. The chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting'") (quoting Gramenos v. Jewel Co., Inc., 797 F.2d 432, 439 (7th Cir. 1986)).

In further support of the position that the officers used reasonable force under the circumstances, defendant furnishes a plausible explanation for Mr. Cunningham's behavior - that he had not taken his medication, or that his psychiatric medication was not effective. (Tr. at 461). The government argues that this caused Mr. Cunningham to inaccurately interpret Officer Flores' actions towards him. (Id.) The Court finds this explanation to be plausible in light of Mr. Cunningham's testimony, the testimony of his counselor, Elizabeth Giasimedes, and that of the expert witnesses. However, even if Mr. Cunningham was not acting or responding rationally to the officers, either because he failed to take his medication or because his psychiatric medication was not effective, this does not grant *carte blanche* to the officers of the Veteran's Administration to restrain and arrest any visitor who is acting irrationally. In a hospital setting such as this, it is to be expected that many visitors suffer from physical and mental disorders that may affect their thinking and perception. The Veteran's Administration has a responsibility to ensure that its staff acts appropriately with the patients who they are there to serve. A veteran of the United States armed forces - and, indeed, anyone suffering from a mental or physical disorder - should not face arrest and detention for exhibiting the symptoms of an illness in the very place where he or she seeks treatment. In this case, however, based on all the evidence credited by the Court, the Court finds that plaintiff has failed to establish by a preponderance of the evidence that the response of the security officers to Mr. Cunningham's behavior on the morning of August 7,

2002 was so excessive as to constitute assault and battery.

Accordingly, the Court denies plaintiff's claim for assault and battery. The Clerk is directed to enter judgment in favor of defendant and to send copies of this Memorandum and Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      January 23, 2007

Cheryl L. Pollak
U.S. Magistrate Judge